UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JOHN M. FLANIGAN,                                   :

                Plaintiff,           :           13 Civ. 4179 (AJP)

        -against-                        :           **OPINION & ORDER**

CAROLYN W. COLVIN, Commissioner of Social    :
Security,
                                    :
                Defendant.           :
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

        Pro se plaintiff John Flanigan brings this action pursuant to § 205(g) of the Social

Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social

Security (the "Commissioner") denying Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") benefits.   (Dkt. No. 2: Compl.)   Presently before the Court is the

Commissioner's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No.

16: Comm'r Notice of Motion.)  The parties have consented to my decision of this case pursuant to

28 U.S.C. § 636(c).  (Dkt. No. 31: Consent to Magistrate Judge Jurisdiction.)

        For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 16) is <u>GRANTED</u>.

## <u>FACTS</u>

### <u>Procedural Background</u>

        In September 2010 Flanigan applied for DIB and SSI benefits, alleging that he was

disabled since November 1, 2008.  (Dkt. No. 13: Admin. Record filed by the Comm'r ("R.") 13, 108;

<u>see also</u> Dkt. No. 2: Compl. ¶ 5.)  Flanigan alleged disability due to chronic obstructive pulmonary

disease ("COPD"), severe back pain, cervical spine impairment, herniated disc, bulging disc, degenerative disc disease, hypertensive cardiovascular disease, hypertension, headaches, spondylosis, neuropathy of the left wrist and high cholesterol.  (R. 112; see also Compl. ¶ 4 .)  On December 10, 2010, the Social Security Administration ("SSA") found that Flanigan was not disabled and denied his applications.  (R. 46-54.)  On January 19, 2011, Flanigan requested an administrative hearing.  (R. 55-60.)

Administrative Law Judge ("ALJ") Robert Gonzalez conducted the administrative hearing on January 31, 2012, at which Flanigan appeared with counsel.  (R. 13, 21-42.)  At the end of the hearing, ALJ Gonzalez left the record open to allow Flanigan's counsel additional time to obtain and submit supplemental medical records, which she did.  (R. 36-41, 205-06, 243-63.)  On April 12, 2012, ALJ Gonzalez issued a written decision finding that Flanigan was not disabled.  (R. 10-17.)  ALJ Gonzalez's decision became the Commissioner's final decision when the Appeals Council denied Flanigan's request for review on April 16, 2013.  (R. 1-3.)

On January 31, 2014, the Commissioner filed a motion for judgment on the pleadings.  (Dkt. No. 16: Comm'r Notice of Motion.)  On February 28, 2014, Flanigan filed an opposition brief attaching supporting documentation, including a limited number of new records that were not considered by ALJ Gonzalez or the Appeals Council.  (See pages 12-15 below.)[1/]  In his

---

[1/]   Flanigan's opposition is a large, unnumbered submission containing arguments interspersed with supporting documents.  (See generally Dkt. No. 19: Flanigan Opp. Br. & Atts.)  As an initial matter, the Court notes that significant portions of Flanigan's arguments are repeated verbatim in multiple sections of the submission.  (Compare Dkt. No. 19-1: Flanigan Opp. Br. at 1-7, with Dkt. No. 19-3: Flanigan Opp. Br. at 35-40, and Dkt. No. 19-4: Flanigan Opp. Br. at 1-4.)  Thus, while three pages of Flanigan's brief inadvertently were omitted when it was docketed by the Court's pro se office, the Court has carefully reviewed the documents and confirmed that all of the arguments contained in the omitted pages are included elsewhere in the docketed versions of Flanigan's brief.  In addition, for ease of reference, the
(continued...)

opposition, Flanigan argues that the November 1, 2008 disability onset date should be amended to December 8, 2008.  (Flanigan Opp. Br. at 4-6; see page 12 below.)  The Commissioner filed its reply brief on April 16, 2014.  (Dkt. No. 27: Comm'r Reply Br.)

The issues before the Court are: (1) whether the Commissioner's decision that Flanigan was not disabled between November 1 and December 31, 2008 (Flanigan's date last insured) is supported by substantial evidence, and (2) whether Flanigan's submission of additional evidence warrants a remand.  Thus, this case involves benefits for at most a two-month period, November-December 2008.

**Non-Medical Evidence**

Flanigan was born on December 11, 1960 and was almost forty-eight years old at the alleged onset of his disability.  (Dkt. No. 13: R. 108.)  Flanigan obtained a general equivalency diploma ("GED") in 1979.  (R. 113.)  Flanigan lives with his wife and three children.  (R. 30.)  Flanigan's family depends on his wife's SSI and Department of Social Services benefits.  (R. 29-30.)

Flanigan worked as a warehouse supervisor from 1980 to 2003.  (R. 25, 113.)  From April 2003 to March 2005, Flanigan received workers' compensation payments, "and once [he] got off that [he] started looking for work again actively."  (R. 25; see page 14 below.)  In July 2008, Flanigan found work as a warehouse supervisor at Burlington Coat Factory, where he performed

---

1/      (...continued)
        Commissioner compiled most of the pages of Flanigan's brief from his submission and assigned consecutive page numbers.  (Dkt. No. 29: Reddy Aff. ¶ 2 & Ex. 1.)  Unless otherwise indicated, citations to Flanigan's opposition brief are to the paginated version submitted with the Commissioner's reply.  (Dkt. No. 29-1: Flanigan Opp. Br.)  Citations to those pages of Flanigan's brief that were not included in the Commissioner's version, however, are to the ECF document numbers and ECF header page numbers of the full submission as originally docketed by the pro se office.  (Dkt. No. 19-3: Flanigan Opp. Br. at 17-19; Dkt. No. 19-5: Flanigan Opp. Br. at 4.)  Likewise, citations to attachments also are to the ECF numbers.  (Dkt. Nos. 19-19-5: Flanigan Opp. Atts.)

"manual labor," "constant lifting, movement," "[l]oading trucks" and "general warehouse work."
(R. 25-27, 113-14.)  Flanigan stopped working at Burlington Coat Factory in December 2008
because his neck pain was causing nausea and severe headaches whenever he had to bend or lift.
(R. 27-31; see page 12 below.)  Flanigan "spoke to [his] doctor about . . . try[ing] to look for another
line of work" involving "less manual labor or no manual labor," such as "something clerical" or
possibly "go[ing] back to school."  (R. 28.)  Flanigan looked for a new job "for a while" but
"couldn't find any especially [because he] was trying to change fields."  (R. 28.)

   Flanigan testified that his condition "deteriorated fast" beginning in December 2009,
and by February 2010 "it was debilitating."  (R. 28-29, 33; see pages 26-27 & n.21 below.)  Flanigan
stated that he experiences neck pain that travels through his back and shoulder into his left hand
where he suffers from nerve impingement.  (R. 33.)  Flanigan also stated that his neck pain causes
nausea and severe headaches.  (R. 31, 33.)  However, the symptoms were not present to that degree
in November 2008.  (R. 33-34.)

   Flanigan reported that he has "had asthma since [he] was young" and that his
condition has been "considered COPD" for approximately "three to four years" (i.e., since January
2008 or 2009).  (R. 34.)  Flanigan stated that his daily COPD symptoms include "[s]hortness of
breath, dizziness, [and] light headedness," which requires him "to use a nebulizer four times a day."
(R. 34-35.)  Flanigan testified that because of his COPD, surgery for his neck and back pain "was
a last resort," and the pain "would have to get more severe before [his doctor] would recommend
[him] doing it."  (R. 34; see R. 227-28; see also page 15 below.)

**Medical Evidence Before the ALJ**

    **2008**

        **January 1, 2008 – October 31, 2008**

        On January 29, 2008, Dr. Kovoor saw Flanigan for flu symptoms and a bad cold. (Dkt. No. 13: R. 255.) On March 31, 2008, Dr. Kovoor saw Flanigan for a bad cold and sinus infection. (R. 254.) On May 30, 2008, Dr. Kovoor saw Flanigan for an earache and sore throat. (R. 253.) On July 31, 2008, Dr. Kovoor saw Flanigan for an unspecified reason. (R. 252.) On September 26, 2008, Dr. Kovoor saw Flanigan for complaints of light headedness and to check his blood pressure. (R. 251.) In his progress notes from the January, March, May and July 2008 visits, Dr. Kovoor indicated that Flanigan suffered from hypertension and asthma. (R. 252-55.)

        **November 1, 2008 – December 31, 2008**

        All of the medical records from this period relate to a right hand injury, which Flanigan candidly admits "had nothing to do with" his alleged disabling conditions. (Dkt. No. 13: R. 27; see also Dkt. No. 29-1: Flanigan Opp. Br. at 4: "The date of November 1, 2008 is the date of a report within the medical records of the treating physician, for the entire year of 2008, which was for a hand injury unrelated to the claim for disability.")

        On November 1, 2008, Flanigan was treated at the Montefiore emergency room after he fell and injured his right hand. (R. 261-62; see R. 200-01.) His aftercare instructions note that Flanigan was taking asthma medication (Proventil and Advair) and was given Tylenol with codeine, and that he was instructed not to return to work for one to two days, not to use his right hand and to set up an appointment at the Montefiore hand clinic. (R. 260-62.) On November 4, 2008, Flanigan had an x-ray taken of his right hand at the Montefiore hand clinic, which showed no

fracture or dislocation.  (R. 201, 203.)  A November 4, 2008 note from the Montefiore hand clinic stated Flanigan "<u>CANNOT</u> return to work" and "[w]ill be seen again next week."  (R. 263.)

On November 7, 2008, Flanigan saw Dr. Kovoor in connection with the previous week's hand injury, and noted that Flanigan "want[ed] clearance for work."  (R. 242, 250.)  Dr. Kovoor also noted that Flanigan was taking Advair and Chlorthalidone to treat his asthma and hypertension, respectively.  (R. 242, 250.)

**2009**

On February 2, 2009, Flanigan complained to Dr. Kovoor of a cough, earache, sore throat and chest congestion for three days.  (R. 249.)  Dr. Kovoor's notes listed Flanigan's medications as Advair and Ventolin for asthma/COPD, Fioricet for migraines, and Chlorthalidone for hypertension.  (R. 249.)  On March 27, 2009, Flanigan saw Dr. Kovoor for a cough and bronchitis.  (R. 248.)  On June 26, 2009, Flanigan saw Dr. Kovoor for a cough; Dr. Kovoor diagnosed COPD exacerbation and prescribed Avelox, Albuterol, Advair and Prednisone.  (R. 247.)

On June 28, 2009, Flanigan was treated at the Montefiore emergency room and was diagnosed with COPD, acute bronchitis and bacterial pneumonia.  (R. 257.)  His aftercare instructions show he was taking Prednisone, Albuterol, Proventil and Advair.  (R. 257.)  He was given prescriptions for Prednisone, Avelox, Combivent inhaler (Albuterol) for COPD and Sonata for insomnia, and instructed to follow up with his own doctor or return at any time if he experienced "any tr[o]uble breathing, fever, chest pain or any other ch[a]nge in condition."  (R. 256-58.)

On September 28, 2009, Dr. Kovoor saw Flanigan for COPD chest pain, back pain, achiness, fevers and coughing with green phlegm, and diagnosed COPD.  (R. 246.)  In late 2009 (probably December 2009), Dr. Kovoor referred Flanigan for testing in connection with his neck and back pain and numbness in his left hand. (R. 28; <u>see</u> R. 210-13, 227-32.)

**2010**

**Hudson Valley Radiology**

On March 5, 2010, Flanigan underwent a cervical spine x-ray examination at Hudson Valley Radiology. (R. 212, 232.) Radiologist Dr. Donna M. Scuderi noted a history of "[n]eck pain with decreased range of motion." (R. 212, 232.) Dr. Scuderi found "straightening of the cervical lordosis" as well as "[d]egenerative spondylosis at the C4-5 through C6-7 levels with bilateral foraminal encroachment at the C5-6 and C6-7 levels and early foraminal encroachment on the left at the C4-5 level." (R. 212, 232.) Dr. Scuderi correlated her findings "with [an] MRI of the cervical spine dated 05/01/2002" and noted that "[t]he findings have progressed since the prior MRI of 2002." (R. 212, 232.)

On March 11, 2010, Flanigan underwent a cervical spine MRI. (R. 210-11, 230-31.) Radiologist Dr. Joel Schwartz noted a history of "[d]isc degeneration," and found "[d]isc degeneration involving C4-5 through C6-7, similar to the prior [i.e., 3/5/10] radiographs" and "[n]eural foraminal encroachment" most severe at C5-6 and C6-7. (R. 210-11, 230-31.)

**Westchester Neurological Consultants: Dr. Roshni Karnani**

On March 15, 2010, Flanigan saw Dr. Roshni Karnani of Westchester Neurological Consultants for the first time. (R. 224-26.) Flanigan presented with "neck pain and numbness in the left hand," and reported a "history of neck trauma," which began "in 2001" when Flanigan was "carrying a pile of books, [and] fell and hit his head and neck posteriorly" while he was "working in Barnes and Nobles." (R. 224.) Dr. Karnani noted that while Flanigan "has been through intense physical therapy 3 times over the last few years," his symptoms have worsened "over the last 6 weeks," in particular "the tingling in the left ha[n]d." (R. 224.) Dr. Karnani further noted that

Flanigan's medical history included high blood pressure, neck pain, back pain, migraines and COPD. (R. 224.)  Dr. Karnani found Flanigan suffered from "C6, C7, and C8 Radiculopathy."  (R. 225.)

On April 9, 2010, Flanigan underwent an electrodiagnostic study at Westchester Neurological Consultants.  (R. 213, 223, 229.)  Flanigan presented to Dr. Karnani "with neck pain radiating to the shoulders and hands with weakness of the left hand."  (R. 213, 223, 229.)  Flanigan told Dr. Karnani that "[t]hese symptoms have been present for years and have been progressing." (R. 213, 223, 229.)  Dr. Karnani concluded that Flanigan's study was abnormal, finding there was "evidence of moderate chronic C5 C6 radiculopathy bilaterally, severe chronic C7 radiculopathy bilaterally" as well as "moderate left more than right median nerve neuropathy at the wrist, most probably related to Carpal Tunnel Syndrome."  (R. 213, 223, 229.)  Flanigan had follow up visits at Westchester Neurological Consultants on May 14, June 4, June 29, July 30, August 27 and November 9, 2010.  (R. 217-22.)

**Dr. Raj Murali**

On August 4, 2010, Flanigan saw Dr. Raj Murali for a neurosurgical consultation. (R. 227-28.)  Dr. Murali noted that Flanigan's "chief complaint is neck pain, midthoracic pain, weakness of the left hand, and diffuse pain in both upper limbs."  (R. 227.)  Flanigan told Dr. Murali that his "symptoms have been present for approximately seven years," but they have "become much worse" during "the last 15 months or so," and that "[f]or the last few months, he has not been able to work because of worsening pain especially in the neck."  (R. 227.)  Dr. Murali reviewed Flanigan's March 2010 MRI, "which shows the presence of diffuse spondylosis and cord compression from C3 through C7."  (R. 227.)  Dr. Murali informed Flanigan "that as the last resort he will be a candidate for cervical laminectomy and instrumented fusion from C3 through C7," noting that "[h]e has already had some physical therapy and pain medications without significant

benefit." (R. 227-28.)  Dr. Murali instructed Flanigan to consider whether he would want the surgery, and opined that it "may benefit him from the pain and motor function point of view." (R. 227-28.)

### Montefiore Medical Center

On September 30, 2010, Flanigan was treated for neck pain at the Montefiore emergency room (R. 193-98), reporting he had experienced "years of intermittent [neck] pain" (R. 194).

On October 30, 2010, Flanigan was treated at the Montefiore emergency room for severe neck and back pain, bronchitis and mild COPD exacerbation.  (R. 179-83; see R. 184-90.) Radiologist Dr. Steven Blumer examined Flanigan and obtained a "single AP portable view of the chest." (R. 187.)  Dr. Blumer found "decreased lung volumes" and a "nodular density at the right lung base which may represent a vessel on end." (R. 187.)  Dr. Blumer recommended "[c]orrelation with prior chest radiographs" and noted that "further evaluation with a CT scan of the chest may be obtained as clinically indicated." (R. 187.)  Flanigan was prescribed Prednisone, Percocet and Tessalon for his cough.  (R. 186.)

### Dr. Kovoor's Multiple Impairment Questionnaire

On December 2, 2010, Dr. Kovoor completed a Multiple Impairment Questionnaire at Flanigan's counsel's request.  (Dkt. No. 13: R. 233-40.)  Dr. Kovoor indicated Flanigan's first date of treatment was February 3, 2010, and diagnosed cervical pain, disc degeneration at C3-C7, carpal tunnel syndrome of the left hand secondary to disc degeneration, spondylosis and spinal cord compression.  (R. 233.)  Dr. Kovoor noted a "fair" prognosis if Flanigan underwent surgery.  (R. 233.)  Dr. Kovoor listed COPD as one of the clinical findings supporting his diagnosis, and noted that Flanigan had "stopped smoking" but was "still having intermittent flare ups." (R. 233-34.)

Dr. Kovoor indicated that during an eight-hour day, Flanigan could stand or walk for two hours at a time and could sit for eight hours with fifteen minute breaks every hour.  (R. 235-36.) Dr. Kovoor noted Flanigan could never lift, carry, grasp, turn or twist any objects of any weight, and could never reach his arms or use his hands for fine manipulations.  (R. 236-37.)  Dr. Kovoor opined that Flanigan's symptoms would interfere with his ability to look up at a computer or down at a desk, cause him to miss work more than three times per month, and likely increase if he were placed in a competitive environment.  (R. 237, 239.)  Dr. Kovoor found these marked limitations consistent with Flanigan's impairments.  (R. 234.)  Last, Dr. Kovoor stated that "the earliest date that the description of symptoms and limitations in this questionnaire applie[d]" was March 2009.  (R. 239.)

### 2011 & 2012

On February 12, 2011, Flanigan was treated at the Montefiore emergency room for COPD exacerbation and prescribed Augmentin, Prednisone and Percocet.  (Dkt. No. 13: R. 156-77.)

In two letters dated December 8, 2011 and February 15, 2012, Dr. Kovoor stated that Flanigan, who he has treated since 2004, "suffers from cervical radiculopathy and neck pain and left upper extremity weakness," and noted that Flanigan's "above complaints have been present since Nov 2008."  (R. 153, 244.)  Dr. Kovoor opined that Flanigan's "injury is not new," citing his March 2010 MRI and "prior imaging for his cervical and thoracic spine with his previous doctors."  (R. 153, 244.)  Dr. Kovoor found that Flanigan's condition "is likely progressive and permanent," "limits him from performing work of any kind," and renders Flanigan "fully disabled."  (R. 153, 244.)[2]

---

[2]   The only substantive difference between Dr. Kovoor's letters is an additional sentence in the February 15, 2012 letter (prepared at Flanigan's counsel's request after the hearing), which states: "Between 9/1/2008 and 3/1/2009 he continued to have cervical symptoms with pain to his left hand.  There is no clinical improvement at this time."  (R. 244; see R. 153.)

**ALJ Gonzalez's Decision**

On April 12, 2012, ALJ Gonzalez issued a written decision denying Flanigan's application for DIB and SSI benefits.  (Dkt. No. 13: R. 10-17.)  ALJ Gonzalez applied the appropriate five-step analysis, considering Flanigan's testimony and the medical record. (R. 14-17.) At the first step, ALJ Gonzalez found that Flanigan "did not engage in substantial gainful activity during the period from his alleged onset date of November 1, 2008 through his date last insured of December 31, 2008." (R. 15.)

At the second step, ALJ Gonzalez found that, "[t]hrough the date last insured, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment." (R. 15.)  Specifically, "there was no evidence of any diagnostic testing or objective clinical findings by treating or examining sources that supported any medically determinable impairment on or before December 31, 2008, the claimant's date last insured." (R. 16.) ALJ Gonzalez noted that Flanigan's request to return to work on November 7, 2008 was inconsistent with a November 1, 2008 disability onset.  (R. 16.)  ALJ Gonzalez found that Dr. Kovoor's December 8, 2011 and February 15, 2012 letters—stating that Flanigan's cervical radiculopathy, neck pain and left upper extremity weakness "complaints have been present since Nov[ember] 2008" (see page 10 above)—were not entitled to any weight, since "those complaints were not substantiated by any diagnostic findings at the time" and because "that claim is not supported by [Dr. Kovoor's] own treatment notes." (R. 16.)  Additionally, ALJ Gonzalez found that Dr. Kovoor's December 2, 2010 opinion set forth in the Multiple Impairment Questionnaire also was not entitled to any weight since it "only referenced a period outside the relevant period," i.e., to March 2009. (R. 16.)  ALJ Gonzalez thus found that "a medically determinable impairment could not be

established from [Flanigan's] alleged onset date through his date last insured" and concluded that

Flanigan was not disabled.  (R. 16-17.)

On April 16, 2013, the Appeals Council denied Flanigan's request for review of ALJ

Gonzalez's decision and it became the Commissioner's final decision.  (R. 1-4.)

## Flanigan's Opposition and Additional Evidence [3/]

Preliminarily, Flanigan argues that the ALJ erroneously based his decision on a

November 1, 2008 onset date.  (Dkt. No. 29-1: Flanigan Opp. Br. at 4-6.)  Flanigan asserts he

originally estimated November 1, 2008 "was the last date that [he] was able to work," but he thought

the exact date "would have to be verified anyway."  (Flanigan Opp. Br. at 5.)  Flanigan states that

"December 8, 2008, is the actual date that [he] could no longer work due to the medical conditions

listed regarding [his] neck, spine."  (Flanigan Opp. Br. at 5; Dkt. No. 19-3: Flanigan Opp. Br. at 17;

Dkt. No. 19: Flanigan Opp. Att. at 11: 12/6/13 Email.)  Flanigan argues that the ALJ's acceptance

of an erroneous onset date "was the cause of devastating consequences to [his] case, including the

ALJ questioning why I requested a note for clearance to return to work after the injury if I was

already disabled, leading the ALJ to question my character and integrity."  (Flanigan Opp. Br. at 4.)

---

[3/]     Although Flanigan's opposition submission included hundreds of pages of medical records
and other supporting documentation (see page 2 above), only the attachments containing
new evidence are described herein, since most of the submitted documents already were in
the record (Dkt. No. 13), including: (1) Montefiore Medical Center records (compare R. 155-
77, 192-99, 256-63, with Dkt. No. 19: Flanigan Opp. Atts. at 12-20, Dkt. No. 19-1: Flanigan
Opp. Atts. at 18-20, 23-27, 32-36, Dkt. No. 19-2: Flanigan Opp. Atts. at 1-8, 24-26, Dkt. No.
19-3: Flanigan Opp. Atts. at 3-16 & Dkt. No. 19-4: Flanigan Opp. Atts. at 5-9); (2) 2010
diagnostic reports (compare R. 210-13, 217-18, 227-31, with Dkt. No. 19-1: Flanigan Opp.
Atts. at 8-11, Dkt. No. 19-2: Flanigan Opp. Atts. at 10-13 & Dkt. No. 19-4: Flanigan Opp.
Atts. at 14); and (3) Dr. Kovoor's treatment notes and letters (compare R. 242, 244, 246-55,
with Dkt. No. 19-1: Flanigan Opp. Atts. at 12-16, 28-31, Dkt. No. 19-2: Flanigan Opp. Atts.
at 14-23, 27-30 & Dkt. No. 19-3: Flanigan Opp. Atts. at 1-2, 22).

Relatedly, Flanigan argues that some medical evidence could not be obtained because it was prohibitively expensive.  As to the absence of contemporaneous records, Flanigan asserts that he could not afford diagnostic testing during the relevant period because he "had no health insurance at the time, and had to wait approximately three months to obtain Medicaid."  (Flanigan Opp. Br. at 5.)  Flanigan states that he chose to see Dr. Kovoor on November 7, 2008 while he was uninsured because he felt "that [his] condition was serious enough . . . even though [he] had to pay in cash for the visit and any medication that [he] was able to afford that was prescribed at the time."  (Flanigan Opp. Br. at 19.)  Flanigan similarly asserts that he was unable to afford the $750 fee to obtain a narrative report from his treating neurologist Dr. Karnani.  (Flanigan Opp. Br. at 12.)[4]

Flanigan's primary argument is that ALJ Gonzalez failed to comply with the treating physician rule and duty to develop the record when he erroneously "focused on a very short, specific time period and not the overall medical record," "failed to obtain or attempt to obtain the records of other physicians identified within the case," and failed to seek clarification regarding Dr. Kovoor's retrospective diagnosis letter.  (See Flanigan Opp. Br. at 6-12; Dkt. No. 19-3: Flanigan Opp. Br. at 18-19.)  Flanigan argues that a full picture of his medical history reveals the progressive deterioration of his "conditions of the spine as well as [his] diagnosis and the severity of [his] COPD," and all of his records should have been "taken together in consideration for disability" by ALJ Gonzalez.  (Flanigan Opp. Br. at 6, 9-14.)

In particular, Flanigan argues that a finding of disability during the relevant period is supported by a comparison of his 2010 and 2002 diagnostic tests (Flanigan Opp. Br. at 5-6), as

---

[4]  Regarding this contention, the Court notes that Flanigan's ongoing treatment with Dr. Karnani in 2010 is reflected in the record, and a narrative report summarizing that evidence would be cumulative.  (R. 213, 217-26, 229; see page 8 above.)

referenced in Dr. Scuderi's March 5, 2010 cervical spine x-ray report indicating that "[t]he findings have progressed since the prior MRI of 2002" (R. 212, 232).  Flanigan attaches records reflecting cervical spine, thoracic spine and lumbar spine MRIs that were taken on May 1, October 30 and November 8, 2002, respectively.  (Dkt. No. 19-2: Flanigan Opp. Att. at 9 & Dkt. No. 19-4: Flanigan Opp. Atts. at 10-12: 5/2/02, 10/30/02 & 11/8/02 MRI Reports.)  The May 2002 cervical spine MRI showed "[m]ultilevel disc degeneration," prominent bulges at C5-C6 and C6-C7 and a "suggestion of nerve root compromise bilaterally at those two levels."  (Dkt. No. 19-2: Flanigan Opp. Att. at 9: 5/2/02 MRI Report.)  The October 2002 thoracic spine MRI showed "[c]entral herniation at T5-T6" and "[m]ultilevel disc disease."  (Dkt. No. 19-4: Flanigan Opp. Att. at 10-11: 10/30/02 MRI Report.)  The November 2002 lumbar spine MRI showed "no evidence of a herniated disc" nor of central spinal or lateral recess stenosis.  (Dkt. No. 19-4: Flanigan Opp. Att. at 12: 11/8/02 MRI Report.)

Similarly, Flanigan argues that ALJ Gonzalez erred by failing to "take[] into account that the injury that [Flanigan] sustained when [he] went on Worker's Compensation had a connection with the deterioration of [his] spine years later," noting that "[n]one of the medical reports from that period of time (worker's compensation) seemed to be connected by the ALJ to [his] current condition for the spine."  (Flanigan Opp. Br. at 18; see Dkt. No. 19-1: Flanigan Opp. Att. at 21-22: N.Y. Workers' Compensation Bd. Notice of Decision, reflecting payments from 4/1/03-3/18/05.)

Flanigan also states that the COPD noted in his 2009 medical records (see page 6 above) was "not a new diagnosis," but rather was simply an indication that he continued to suffer from COPD, which first was diagnosed in 1996.  (Flanigan Opp. Br. at 8-9, 11.)  In support, Flanigan attaches a doctor's note dated September 20, 1996 stating that Flanigan "continues to have chronic asthma with daily symptoms."  (Dkt. No. 19-1: Flanigan Opp. Att. at 17: 9/20/96 Note.)  Flanigan also states that Dr. Kovoor has been treating his COPD since he became a patient in 2004

(Dkt. No. 19-3: Flanigan Opp. Br. at 18), and attaches an October 26, 2004 progress note from Dr. Kovoor reflecting treatment for COPD (Dkt. No. 19-3: Flanigan Opp. Att. at 20: 10/26/04 Note).

Finally, Flanigan alleges that ALJ Gonzalez erroneously "failed to obtain or attempt to obtain the records of other physicians identified within the case," and refers specifically to Dr. Karnani's April 9, 2010 examination report as reflecting an incomplete depiction of what was actually ongoing treatment with Dr. Karnani. (Flanigan Opp. Br. at 12; see R. 213, 229.) Flanigan likewise argues that ALJ Gonzalez should have contacted Dr. Murali regarding the August 4, 2010 report indicating surgery as a last resort, because he could have elaborated on the recommendation and explained "that the severity of [Flanigan's] COPD is such that [Dr. Murali] was not confident that [Flanigan] could survive an approximate five hour operation, nor recover fully," particularly since Flanigan had been taking Prednisone to treat his COPD. (Flanigan Opp. Br. at 12-14.)

## ANALYSIS

## I.  THE APPLICABLE LAW

### A.  Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[5/]

---

[5/]      See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010);
(continued...)

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[6/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[7/]

---

[5/]     (...continued)
Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

[6/]     See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[7/]     See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & (continued...)

**B.**     **Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination.  E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[8/]  "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'"  Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[9/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g.,

---

[7/]     (...continued)
Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[8/]     See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

[9/]     See also, e.g., Karle v. Astrue, 12 Civ. 3933, 2013 WL 2158474 at *9 (S.D.N.Y. May 17, 2013) (Peck, M.J.), report & rec. adopted, 2013 WL 4779037 (S.D.N.Y. Sept. 6, 2013); Santiago v. Astrue, 11 Civ. 6873, 2012 WL 1899797 *13 (S.D.N.Y. May 24, 2012) (Peck, M.J.); Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[10/] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence."  Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'"  Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[11/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find

---

[10/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[11/]   See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

> nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[12/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[13/]

---

[12/]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[13/]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d at 106; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

**C.      The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner

in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.

Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity
> of your impairment(s) is well-supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not inconsistent with the other substantial
> evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700

(2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254

F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).[14/]

Further, the regulations specify that when controlling weight is not given a treating

physician's opinion (because it is not "well supported" by other medical evidence), the ALJ must

consider the following factors in determining the weight to be given such an opinion: (1) the length

of the treatment relationship and the frequency of examination; (2) the nature and extent of the

treatment relationship; (3) the evidence that supports the treating physician's report; (4) how

consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the

physician in contrast to the condition being treated; and (6) any other factors which may be

significant.  20 C.F.R. § 404.1527(d)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

---

[14/]     See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346 (2d Cir. 2005); Tavarez v.
Barnhart, 124 F. App'x 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 F. App'x 306, 308
(2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v.
Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5
(2d Cir. 2002); Jordan v. Barnhart, 29 F. App'x 790, 792 (2d Cir. 2002); Bond v. Soc. Sec.
Admin., 20 F. App'x 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir.
2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec.,
143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

Cir. 2013); <u>Gunter</u> v. <u>Comm'r of Soc. Sec.</u>, 361 F. App'x 197, 197 (2d Cir. 2010); <u>Foxman</u> v. <u>Barnhart</u>, 157 F. App'x at 346-47;  <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d at 32; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 134; <u>Clark</u> v. <u>Comm'r of Soc. Sec.</u>, 143 F.3d at 118; <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d at 503.[15/]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not."  <u>Snell</u> v. <u>Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999); <u>see</u>, <u>e.g.</u>, <u>Cichocki</u> v. <u>Astrue</u>, 534 F. App'x at 75; <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to <u>Snell</u> but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); <u>Ferraris</u> v. <u>Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); <u>Ramos</u> v. <u>Barnhart</u>, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in <u>Schisler</u> v. <u>Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993).

---

[15/]    <u>See also</u>, <u>e.g.</u>, <u>Kugielska</u> v. <u>Astrue</u>, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. Oct. 16, 2007); <u>Hill</u> v. <u>Barnhart</u>, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); <u>Klett</u> v. <u>Barnhart</u>, 303 F. Supp. 2d 477, 484 (S.D.N.Y. 2004); <u>Rebull</u> v. <u>Massanari</u>, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

**D.      The ALJ's Duty to Develop the Record**

It is the "well-established rule in [the Second] circuit" that the ALJ must develop the

record, even where, as here, the claimant was represented by counsel:

> Even when a claimant is represented by counsel, it is the well-established rule
> in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf
> of all claimants . . . affirmatively develop the record in light of the essentially non-
> adversarial nature of a benefits proceeding." Lamay v. Comm'r of Soc. Sec., 562
> F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted)[,
> cert. denied, 559 U.S. 962, 130 S. Ct. 1503 (2010)]; accord Butts v. Barnhart, 388
> F.3d 377, 386 (2d Cir. 2004), [amended on other grounds], 416 F.3d 101 (2d Cir.
> 2005); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996); see also Gold v. Sec'y of
> Health, Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972) (pro se claimant).  Social
> Security disability determinations are "investigatory, or inquisitorial, rather than
> adversarial." Butts, 388 F.3d at 386 (internal quotation marks omitted).  "[I]t is the
> ALJ's duty to investigate and develop the facts and develop the arguments both for
> and against the granting of benefits." Id. (internal quotation marks omitted); accord
> Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).[16/]

## II.      APPLICATION OF THE FIVE-STEP SEQUENCE TO FLANIGAN'S CLAIM

**A.      Flanigan Was Not Engaged In Substantial Gainful Activity**

The first inquiry is whether Flanigan was engaged in substantial gainful activity after

his application for SSI benefits.  "Substantial gainful activity" is defined as work that involves

"doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or

profit." 20 C.F.R. § 404.1510.

---

[16/]      See also, e.g., 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416.912(d),
416.912(e)(2); Padula v. Astrue, 514 F. App'x 49, 51 (2d Cir. 2013); Winn v. Colvin, 541
F. App'x 67, 70 (2d Cir. 2013); Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); Perez
v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); Echevarria v. Sec'y of Health & Human Servs., 685
F.2d 751, 755 (2d Cir. 1982); Torres v. Barnhart, 02 Civ. 9209, 2007 WL 1810238 at *9
(S.D.N.Y. June 25, 2007) (Peck, M.J.) (& cases cited therein).

ALJ Gonzalez concluded that Flanigan "did not engage in substantial gainful activity during the period from his alleged onset date of November 1, 2008 through his date last insured of December 31, 2008." (Dkt. No. 13: R. 15; see page 11 above.) In connection with his opposition argument that the ALJ failed to establish the correct onset date, Flanigan submitted an email from Burlington Coat Factory showing that Flanigan worked until December 8, 2008. (Dkt. No. 19: Flanigan Opp. Att. at 11: 12/6/13 Email; see page 12 above.) Nevertheless, because ALJ Gonzalez's conclusion that Flanigan did not engage in substantial gainful activity during the relevant period benefits Flanigan at the first step, the Court proceeds to the second step of the five-step analysis.

**B.      Flanigan Did Not Demonstrate "Severe" Medically Determinable Impairments That Significantly Limited His Ability To Do Basic Work Activities**

The second step of the analysis is to determine whether Flanigan proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6). The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'"

McDowell v. Colvin, No. 11-CV-1132, 2013 WL 1337152 at *6 (N.D.N.Y. Mar. 11, 2013), report & rec. adopted, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[17]

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999). On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken. See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

### 1. Substantial Evidence Supports ALJ Gonzalez's Finding That Flanigan Did Not Demonstrate Severe Medically Determinable Impairments Prior To His December 31, 2008 Date Last Insured

ALJ Gonzalez determined that because "there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment through December

---

[17]    Accord, e.g., Whiting v. Astrue, No. Civ. A. 12-274, 2013 WL 427171 at *2 (N.D.N.Y. Jan. 15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to establish disability; instead, it is the impact of the disease, and in particular any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry.'"), report & rec. adopted, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013); Lohnas v. Astrue, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011), aff'd, 510 F. App'x 13 (2d Cir. 2013); Hahn v. Astrue, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t is not sufficient that a plaintiff 'establish[] the mere presence of a disease or impairment.' Rather, 'the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.'" (citation omitted)); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a disease or impairment is not disabling within the meaning of the Social Security Act.").

31, 2008, the date last insured," Flanigan "must be found not disabled at step 2 of the sequential

evaluation process (SSR 96-4p)."  (R. 15-16; see page 11 above.)[18]  ALJ Gonzalez found that "the

medical record was absent objective findings or evidence of treatment prior to December 31, 2008

or within a period of substantial proximity to [Flanigan's] date last insured," and thus "concluded

that a medically determinable impairment could not be established from [Flanigan's] alleged onset

date through his date last insured."  (R. 16; see pages 11-12 above.)

Contrary to establishing the existence of a severe impairment before December 31,

2008, at best the evidence shows that Flanigan experienced progressively worsening symptoms that

eventually became disabling sometime in 2009 at the earliest.  In a December 2010 Multiple

Impairment Questionnaire, Dr. Kovoor indicated that March 2009 was the earliest date that

Flanigan's disabling limitations applied.  (R. 239; see page 10 above.)  Further, Dr. Kovoor's

---

[18]     Social Security Ruling 96-4p provides, in relevant part:

> 1.  A "symptom" is not a "medically determinable physical or mental impairment"
> and no symptom by itself can establish the existence of such an impairment.
>
> 2.  In the absence of a showing that there is a "medically determinable physical or
> mental impairment," an individual must be found not disabled at step 2 of the
> sequential evaluation process.  No symptom or combination of symptoms can be the
> basis for a finding of disability, no matter how genuine the individual's complaints
> may appear to be, unless there are medical signs and laboratory findings
> demonstrating the existence of a medically determinable physical or mental
> impairment.

SSR 96-4p, 1996 WL 374187 (July 2, 1996) (emphasis added).  Medical signs are defined
as "anatomical, physiological, or psychological abnormalities which can be observed, apart
from [the claimant's] statements (symptoms)," and which "must be shown by medically
acceptable clinical diagnostic techniques."  20 C.F.R. § 404.1528(b).  Laboratory findings
are defined as "anatomical, physiological, or psychological phenomena which can be shown
by the use of medically acceptable laboratory diagnostic techniques," such as "chemical
tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.),
roentgenological studies (X-rays), and psychological tests."  20 C.F.R. § 404.1528(c).

contemporaneous progress notes reflect that he saw Flanigan ten times in 2008 and 2009, and there

is no indication of a back or neck condition until September 28, 2009, when Flanigan complained

of back pain and achiness.  (See pages 5-6 above.)[19]  Dr. Kovoor also did not refer Flanigan for

diagnostic testing until sometime between December 2009 and March 2010 (see R. 28), with the

earliest objective medical findings produced by those tests being from March and April 2010 (see

pages 7-8 above).[20]

       ALJ Gonzalez's conclusion also is supported by Flanigan's own statements and

testimony.  On March 15, 2010, Flanigan reported to Dr. Karnani that "over the last 6 weeks, the

tingling in the left ha[n]d has gotten worse."  (See page 7 above.)  Likewise, on August 4, 2010,

Flanigan reported to Dr. Murali that "in the last 15 months or so, he has become much worse."  (See

page 8 above.)  Additionally, during the hearing, Flanigan reiterated several times that his condition

---

[19]    Contrary to Flanigan's argument (see page 12 above), although ALJ Gonzalez noted that Dr. Kovoor's November 7, 2008 record indicated Flanigan "want[ed] clearance for work," which was inconsistent with "claiming the onset of disability beginning November 1, 2008, only one week prior" (R. 16, 242, 250), amending the onset date to December 8, 2008 to cure that inconsistency would not change the fact that there simply is no evidence to substantiate the existence of a sufficiently severe medically determinable impairment prior to the expiration of Flanigan's insured status.

[20]    Flanigan asserts that the only reason he did not undergo diagnostic testing when he stopped working in December 2008 was because he was uninsured and thus could not afford "tests of any nature."  (Dkt. No. 29-1: Flanigan Opp. Br. at 5; see page 13 above.)  However, Flanigan also states that he obtained medical insurance (Medicaid) approximately three months later, i.e., in or about March 2009.  (Flanigan Opp. Br. at 5: "I obtained medical treatment as soon as possible, as I had no health insurance at the time, and had to wait approximately three months to obtain Medicaid. . . . I did get medical treatment as soon as I obtained medical insurance, which was about three months later.")  Thus, Flanigan's inability to pay for diagnostic testing between December 2008 and March 2009 does not explain why, if Dr. Kovoor had in fact deemed such tests to be necessary in December 2008, Flanigan would have waited until March 2010, a year after obtaining insurance, to get them.

did not worsen to its present state until approximately December 2009,[21] and that he would have been capable of performing "clerical" work or "go[ing] back to school" in December 2008 when he first left his manual labor job (see page 4 above).

        Accordingly, ALJ Gonzalez's determination is supported by substantial evidence (or rather the absence of medical evidence during the November-December 2008 period in issue). See, e.g., Swainbank v. Astrue, No. 06-CV-248, 2008 WL 731302 at *1-3 (D. Vt. Mar. 18, 2008) ("The plaintiff has the burden of demonstrating that she suffered from a disabling impairment on or before December 31, 1984, when her insured status expired . . . . In order for the plaintiff to meet her burden she must show that the impairment was medically determinable and significantly limited her ability to perform basic work activities. Social Security regulations require that when there is no medically determinable impairment, that is, an impairment verified by medical signs or laboratory findings, the application must be denied at step 2 of the sequential evaluation process because there is no severe impairment. . . . The first note in the record indicating a complaint of a sleep problem was in October 1992, almost eight years after the expiration of plaintiff's insured status. . . . [A] test

---

[21]    See R. 27-28 (stating he stopped working "around November of 2008" and that "at that point [he] wasn't in the condition that [he is] now"); R. 28 ("Around December of 2009 it started to get worse actually and I noticed an occasional numbness in my left hand. The pain in my neck was becoming more and more severe and I really didn't do anything about it at that point until February when I wo[ke] up one morning and literally my left hand was completely numb. My fingers, I couldn't move it and at that point in time I went back to my doctor and he referred me to a neurologist. He said, look you have a problem here. You need to go through a certain amount of tests. Your condition has deteriorated and we need to find out actually how fast and how far."); R. 29 ("But until that point in time [in December 2009] it wasn't at that state. It was bad enough for me not to be able to [do] the manual work but it wasn't to the point where I thought I couldn't work anymore. And it just it really deteriorated very quickly."); R. 33 ("Oh the -- well it deteriorated fast. It started around December of 2009. I noticed it starting to get worse. And it got to the point literally where it was debilitating by February [of 2010]."); R. 33-34 (stating that the symptoms he experienced in 2010 were "present in November of 2008" but "[n]ot to that degree," i.e., "not to the point where they went" in 2010).

in 2003 identified sleep apnea.  This was the first time that a medical test demonstrated a severe

sleeping impairment. . . . [A]s noted above, the medical records during the relevant period fail to

show that plaintiff complained of a sleep problem. . . . The administrative law judge . . . correctly

summarized the issue in this case: 'Thus, regardless of how genuine the claimant's complaints may

appear to be, when there are no medical signs or laboratory findings to substantiate the existence of

a medically determinable physical or mental impairment that could reasonably be expected to

produce the claimant's symptoms, a finding of not disabled is required at step two of the sequential

evaluation process.'  The Court finds that the decision of the Commissioner is supported by

substantial evidence . . . ." (citations & emphasis omitted)), aff'd, 356 F. App'x 545 (2d Cir. 2009);

see also, e.g., Jones v. Astrue, No. 09-CV-1232, 2012 WL 1605566 at *7 (N.D.N.Y. Apr. 17, 2012)

("[T]he ALJ's sequential evaluation ended at step two, with the (adequately supported) conclusion

that there were no medical signs or laboratory findings to substantiate the existence of a medically

determinable impairment on or before December 31, 2001.  . . . This Court finds no error with

respect to this aspect of the ALJ's decision."), report & rec. adopted, 2012 WL 1605593 (N.D.N.Y.

May 8, 2012).

### 2. ALJ Gonzalez's Decision To Afford No Weight To Dr. Kovoor's Retrospective Opinions Did Not Constitute Reversible Legal Error

In making his determination that Flanigan failed to establish a severe medically

determinable impairment during the relevant period, ALJ Gonzalez concluded that Dr. Kovoor's

December 2, 2010 and February 15, 2012 opinions were not entitled to any weight.  (Dkt. No. 13:

R. 16; see page 11 above.)   First, Dr. Kovoor's December 2, 2010 Multiple Impairment

Questionnaire does not support the existence of a medically determinable impairment before

December 31, 2008; Dr. Kovoor opined that the symptoms and limitations described therein applied

no earlier than March 2009, a date outside of Flanigan's insured period.  (R. 239; see page 10 above.)

Thus, ALJ Gonzalez properly decided not to give the opinion weight, since it "only referenced a

period outside the relevant period."  (R. 16; see page 11 above.)  See, e.g., Papp v.Comm'r of Soc.

Sec., 05 Civ. 5695, 2006 WL 1000397 at *15 (S.D.N.Y. Apr. 18, 2006) (Peck, M.J.) ("The reports

that [the doctor] prepared on July 15, 2002 and June 25, 2003 describe [claimant's] symptoms as of

those dates, which are well after [the claimant's] June 30, 2001 last insured date, and therefore they

are irrelevant to this analysis."); Dailey v. Barnhart, 277 F. Supp. 2d 226, 233 n.14 (W.D.N.Y. 2003)

("Medical opinions given after the date that [the claimant's] insured status expired are taken into

consideration if such opinions are relevant to her condition prior to that date." (emphasis added));

see also, e.g., Dominick v. Bowen, 861 F.2d 1330, 1333 (5th Cir. 1988) (SSA properly disregarded

evidence of post-insured status mental disorders); Tecza v. Astrue, Civ. A. No. 08-242, 2009 WL

1651536 at *10 (W.D. Pa. June 10, 2009) (The doctor's "opinions . . . were generated well after the

Plaintiff's insured status expired (thirteen months and twenty months respectively), are temporally

remote from the Plaintiff's date last insured and do not address the Plaintiff's level of functioning

during the relevant time period.  Given the content and remoteness of these opinions, they have no

relevance to the Plaintiff's condition prior to the expiration of his insured status." (collecting cases));

Acosta v. Barnhart, 99 Civ. 1355, 2003 WL 1877228 at *12-13 (S.D.N.Y. Apr. 10, 2003) (Peck,

M.J.) (although medical reports from June 1998 definitively showed that claimant was disabled,

those reports did not show that claimant was disabled prior to his last insured date of December 31,

1995).

        Second, Dr. Kovoor's February 15, 2012 letter stated that Flanigan "suffers from

cervical radiculopathy and neck pain and left upper extremity weakness" and that "[h]is above

complaints have been present since Nov 2008."  (R. 244; see page 10 above.)  ALJ Gonzalez found

that because the complaints referenced in Dr. Kovoor's letter "were not substantiated by any diagnostic findings at the time," his opinion was not entitled to any weight "as it [was] not supported by medical signs and laboratory findings showing that the claimant has a medical impairment which could reasonably produce the pain and limitations alleged."  (R. 16; see page 11 above.)

        As an initial matter, even assuming arguendo that there was evidentiary support for Dr. Kovoor's retrospective onset statements—i.e., that Flanigan's "complaints have been present since Nov 2008" and that "he continued to have cervical symptoms with pain" between September 2008 and March 2009—those statements substantiate only that the conditions or symptoms existed in 2008, but not necessarily that they were as severe and disabling in 2008 as they had become by the time Dr. Kovoor prepared the February 2012 letter.  See, e.g., Ratliff v. Barnhart, 92 F. App'x 838, 840 (2d Cir. 2004); Salvaggio v. Apfel, 23 F. App'x 49, 50-51 (2d Cir. 2001) ("Our independent review of the record reveals that the plaintiff did suffer from multiple sclerosis beginning as early as 1989.  However, we find substantial evidence supporting the ALJ's finding that prior to 1989 the nature of the plaintiff's symptoms cannot be established from independent sources.  We conclude that this lack of independent medical evidence, the result of the plaintiff's choice to seek only minimal medical attention for her symptoms prior to 1989, supports the finding that the plaintiff was not under a disability as defined by the Social Security Act at any time prior to the time her insured status expired."); Roy v. Apfel, No. 99-6153, 201 F.3d 432 (table), 1999 WL 1295361 at *2 (2d Cir. Dec. 22, 1999) ("The issue here is whether appellant's disability constituted a 'severe impairment' as of June 30, 1977.  Thus, even assuming that her depression began at some point prior to June 30, 1977, that does not suffice to prove that the depression was a severe impairment as of that date.").[22]

---

[22]     See also, e.g., Papp v. Comm'r of Soc. Sec., 2006 WL 1000397 at *17 ("For the period
                                                                                    (continued...)

Moreover, the major problem with Flanigan's claim that ALJ Gonzalez violated the treating physician rule is that while Dr. Kovoor opined in February 2012 that Flanigan's impairments were present in 2008, he gave no basis for his conclusion and, apparently, did not refer Flanigan to a specialist for diagnostic testing until early 2010.  (See pages 6-8 above.)  The ALJ's determination to give no weight to Dr. Kovoor's ipse dixit after the fact opinion was not erroneous.  See, e.g., Ratliff v. Barnhart, 92 F. App'x at 840 ("Although the ALJ is normally obligated to give the treating physician's opinion controlling weight, where that opinion is not supported by medical evidence or

_____

22/     (...continued)
before June 30, 2001, [claimant's] date last insured, the contemporaneous records of . . . [claimant's doctor] show that while [claimant] was depressed, she was 'doing well' on her medications. [Doctor's] treating notes from that key period provide substantial evidence to support the ALJ's conclusion that [claimant] was not disabled.  [Doctor's] later reports, in July-August 2002 and in 2003, specifically stated that they applied to [claimant's] then 'present' condition, and thus do not provide evidence as to her condition in the January-June 2001 period." (citations omitted)); Velez v. Barnhart, 03 Civ. 0778, 2004 WL 1464048 at *4 (S.D.N.Y. May 28, 2004) ("[W]hile the evidence of medical treatment received by [claimant] after [his last date insured] 'is not irrelevant' to a determination of disability prior to that date, there is no evidence that [claimant's] condition was as severe prior to [his date last insured] as it was at the time of such treatment.  Even if some or all of [claimant's] conditions did accrue on or before [his date last insured], however, the evidence is insufficient to show that those conditions rose to the level of a 'disability,' as defined by the Act." (citations omitted)); Acosta v. Barnhart, 2003 WL 1877228 at *12 ("While [claimant's] doctor] diagnosed [claimant] as having 'low back pain' and 'anxiety disorder' [in May 1996], he did not opine as to whether [claimant] was disabled as of that date, nor did he provide any opinion or medical evidence that [claimant] was disabled as of December 1995, his last insured date.  Thus, [claimant] failed to show the existence of a disability since he presented no medical evidence as to his condition during the pre-May 1996 period." (citation omitted)); Keller v. Barnhart, 01 Civ. 4334, 2002 WL 31778867 at *3 (S.D.N.Y. Dec. 12, 2002) (Claimant "has not sustained his burden of showing that he was disabled prior to December 31, 1989, the date he was last insured for disability insurance benefits.  Although the medical evidence of record shows that [claimant] may currently have severe impairments, this evidence post-dates [claimant's] last insured date by approximately ten years.  There is no evidence regarding treatment from January 1, 1987 to December 31, 1989. . . . The record contains two letters from [a doctor] which suggest that [claimant] may have had back trouble during the relevant period.  However, this evidence is insufficient to establish disability. . . . The ALJ properly decided that [claimant] failed to establish the existence of a severe impairment during the relevant period.").

is contradicted by other substantial evidence in the record, the ALJ is entitled to use discretion in weighing the medical evidence as a whole."); Taylor v. Barnhart, 83 F. App'x 347, 349 (2d Cir. 2003) (same); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." (citations omitted)).

This is particularly true where, as here, "there is medical evidence in the record that contradicts the retrospective opinions of" Dr. Kovoor, Roy v. Apfel, 1999 WL 1295361 at *3, including his own contemporaneous treatment records.  As described above, Flanigan saw Dr. Kovoor ten times in 2008 and 2009 but only complained of back pain for the first time on September 28, 2009 (see page 26 above), which is consistent with Flanigan's statements and testimony about the deterioration of his condition beginning in late 2009 and causing total debilitation by February 2010 (see pages 26-27 & n.21 above).  See, e.g., Monette v. Astrue, 269 F. App'x 109, 113 (2d Cir. 2008) ("no error in the ALJ's refusal to accord [treating physician's] retrospective opinion significant weight because there is substantial evidence that the opinion is contradicted by other evidence," including "[n]on-medical evidence" and medical "assessments [that] are far more contemporaneous assessments of [claimant's] condition than [treating physician's] retrospective conclusion"); Roy v. Apfel, 1999 WL 1295361 at *3 (Treating physician's "letter was properly discounted because it is quite vague, contradicts his prior letter that mentions only appellant's 'deep vein thrombosis . . . and pulmonary embolus' during the relevant time period, and is not supported by 'medically acceptable clinical and laboratory diagnostic techniques.'"); O'Connor v. Shalala, No. 96-6215, 111 F.3d 123 (table), 1997 WL 165381 at *1 (2d Cir. Mar. 31, 1997) ("Rather than being 'well-supported by medically-acceptable clinical and laboratory diagnostic techniques,' [treating doctor's] opinion was speculative, and was contradicted by substantial other evidence, including contradictory evidence

of [claimant's] social interactions during the relevant period, and the absence of any contemporaneous evidence of the existence of a psychiatric impairment.  In determining the existence of a disability, the Commissioner is also entitled to rely on the absence of contemporaneous evidence of the disability.  The Commissioner's conclusion that [claimant] was not suffering from a mental impairment prior to September 30, 1992, was not based on legal error and was supported by substantial evidence." (citations omitted)).[23/]

Given the substantial evidence establishing that Flanigan's condition had not become a medically determinable severe impairment before December 31, 2008, ALJ Gonzalez was not required to contact Dr. Kovoor in order to satisfy the duty to develop the record.  See, e.g., Micheli v. Astrue, 501 F. App'x 26, 29-30 (2d Cir. 2012) ("The mere fact that medical evidence is conflicting or internally inconsistent does not mean that an ALJ is required to re-contact a treating physician.  Rather, because it is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record where the record provides sufficient evidence for such a resolution, the ALJ will weigh all of the evidence and see whether it can decide whether a claimant is disabled based on the evidence he has, even when that evidence is internally inconsistent.  Here, the ALJ properly determined that he could render a decision based on the 500-page record already before

---

[23/]   See also, e.g., Saviano v. Chater, No. 97-6124, 152 F.3d 920 (table), 1998 WL 314386 at *3 (2d Cir. May 8, 1998); Nelson v. Colvin, No. 12-CV-1810, 2014 WL 1342964 at *10 (E.D.N.Y. Mar. 31, 2014) ("'[T]he Second Circuit has stated that it is entirely appropriate to give a treating physician's opinion less weight when it is internally inconsistent.'"); Halmers v. Colvin, No. 12-CV-00288, 2013 WL 5423688 at *4-5 (D. Conn. Sept. 26, 2013); Sisto v. Colvin, No. 12-CV-2258, 2013 WL 4735694 at *9 (E.D.N.Y. Sept. 3, 2013); Papp v. Comm'r of Soc. Sec., 2006 WL 1000397 at *17 (no controlling weight where "there were inconsistencies between [doctor's] contemporaneous treatment notes and his later opinion").

him despite the discrepancies in [treating physician's] assessment." (citations omitted)).[24]   The

adequacy of ALJ Gonzalez's development of the record is further evidenced by his statements during

the hearing regarding the completeness of medical files and his willingness to leave the record open

and receive supplemental evidence, which he did.   (See page 2 above.)   See, e.g., Gonzalez v.

Astrue, 08 Civ. 3595, 2012 WL 555305 at *12 (S.D.N.Y. Feb. 21, 2012) (ALJ "satisfied his

affirmative obligation to develop the administrative record" when he "kept the record open after the

administrative hearing to give plaintiff's . . . representative an opportunity to submit additional

medical evidence of disability prior to plaintiff's last insured date.").[25]

## III.   THE COURT NEED NOT REMAND THIS ACTION TO THE COMMISSIONER BECAUSE FLANIGAN'S NEWLY SUBMITTED EVIDENCE SUPPORTS THE COMMISSIONER'S DECISION AND IS NOT MATERIAL TO FLANIGAN'S CONDITION DURING THE RELEVANT TIME PERIOD

A limited number of the medical records submitted with Flanigan's opposition brief

are not part of the Administrative Record.   (See generally Dkt. Nos. 19-19-5: Flanigan Opp. Br. &

Atts.; see also pages 12-15 above.)   Evidence not contained in the administrative record may not be

considered when reviewing the findings of the Commissioner.  See, e.g., 42 U.S.C. § 405(g) ("The

---

[24]      See also, e.g., Perez v. Chater, 77 F.3d 41, 47-48 (2d Cir. 1996); Petell v. Comm'r of Soc. Sec., No. 12-CV-1596, 2014 WL 1123477 at *10 (N.D.N.Y. Mar. 21, 2014); Cordero v. Astrue, 11 Civ. 5020, 2013 WL 3879727 at *3 (S.D.N.Y. July 29, 2013); Hall v. Astrue, 677 F. Supp. 2d 617, 628 (W.D.N.Y. 2009).

[25]      See also, e.g., Weingarten v. Apfel, 98 Civ. 2475, 1999 WL 144486 at *4 (S.D.N.Y. Mar. 17, 1999) (ALJ "made every reasonable effort to fully develop the record" where he "consented to plaintiff's attorney's request to keep the record open one week after the hearing to enable the attorney to submit any additional information"); Robinson v. Chater, 94 Civ. 0057, 1996 WL 5067 at *7 (S.D.N.Y. Jan. 5, 1996) ("[T]he ALJ twice informed [claimant's] representative that the record would be kept open in order for new medical records to be submitted.  When claimant's representative indicated that he would attempt to locate the document within three weeks after the hearing, and that he would contact the ALJ if he were not able to do so, the ALJ was under no further obligation." (citation omitted)).

court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security . . . ."); Carnevale v. Gardner, 393 F.2d 889, 891 n.1 (2d Cir. 1968) (district court correctly refused to consider materials not properly in administrative record); Nieves v. Colvin, 13 Civ. 0107, 2014 WL 1377582 at *17 (S.D.N.Y. Apr. 3, 2014) (Peck, M.J.); Castro v. Acting Comm'r of Soc. Sec., 97 Civ. 5364, 1998 WL 846749 at *10 n.11 (S.D.N.Y. Dec. 2, 1998) (new evidence not considered because "this court is limited in its review to the record before the Commissioner"); Grubb v. Chater, 992 F. Supp. 634, 637 n.3 (S.D.N.Y. 1998) (new evidence not considered because "[a] court's review of the Commissioner's decision is to be based upon the administrative record"); Madrigal v. Callahan, 96 Civ. 7558, 1997 WL 441903 at *7 (S.D.N.Y. Aug. 6, 1997) ("[I]n reviewing decisions of the Commissioner, this Court cannot consider new evidence not made part of the administrative record.").

Although the Court cannot consider new evidence, this Court may remand to the Commissioner to consider new evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). The Second Circuit has summarized the three-part showing required by this provision as follows:

> [A]n appellant must show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently. Finally, claimant must show (3) good cause for her failure to present the evidence earlier.

Jones v. Sullivan, 949 F.2d 57, 60 (2d Cir. 1991) (citations & quotations omitted, emphasis added) (quoting Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988)).[26/]

To the extent Flanigan's newly proffered evidence is not cumulative of what already is in the record (see page 12 n.3 above), it is immaterial to establishing disability during the relevant time period.  As discussed above, without more, records that merely show the existence of a condition prior to the expiration of Flanigan's insured status—i.e., the 2002 MRIs and the COPD treatment notes from 1996 and 2004 (see pages 14-15 above)—even if considered, would not substantiate that Flanigan's condition was sufficiently severe to constitute a disability prior to December 31, 2008.  (See cases cited on page 30 above.)  Moreover, evidence of Flanigan's 2003 workers' compensation claim (see page 14 above) is not relevant because of the different legal standards.  See, e.g., Simmons v. Colvin, 13 Civ. 1724, 2014 WL 104811 at *7 n.5 (S.D.N.Y. Jan. 8, 2014) (remand for consideration of workers' compensation evidence not required since the "'standards which regulate workers' compensation relief are different from the requirements which govern the award of disability insurance benefits'"); DiPalma v. Colvin, 951 F. Supp. 2d 555, 574 (S.D.N.Y. 2013) (Peck, M.J.).[27/]

---

[26/]    Accord, e.g., Lisa v. Sec'y of Dep't of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991); DeJesus v. Apfel, 97 Civ. 4779, 2000 WL 1586419 at *3 (S.D.N.Y. Oct. 24, 2000); Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *2 & n.6  (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); Pantojas v. Apfel, 87 F. Supp. 2d 334, 339 (S.D.N.Y. 2000); Casiano v. Apfel, 39 F. Supp. 2d 326, 331 (S.D.N.Y. 1999), aff'd, 205 F.3d 1322 (2d Cir. 2000); Hursey v. Apfel, No. 97 Civ. 4757, 1998 WL 812585 at *4 (E.D.N.Y. Apr. 27, 1998); Tracy v. Apfel, No. 97-CV-4357, 1998 WL 765137 at *4 (E.D.N.Y. Apr. 22, 1998); Madrigal v. Callahan, 1997 WL 441903 at *7-8; Counterman v. Chater, 923 F. Supp. 408, 414 (W.D.N.Y. 1996).

[27/]    See also, e.g., Gillespie v. Astrue, No. 09-CV-2198, 2012 WL 3646820 at *13 (E.D.N.Y. Aug. 23, 2012) ("Plaintiff's treating physicians opined that he was disabled with regard to workers' compensation.  However, those determinations are not dispositive, because the standards for workers' compensation are different than those under the Act."); Rokitka v. (continued...)

Accordingly, Flanigan's newly proffered evidence supports the ALJ's decision and does not require a remand.

## CONCLUSION

For the reasons set forth above, the Commissioner's determination that Flanigan was not disabled within the meaning of the Social Security Act during the period from November 1, 2008 (or December 8, 2008) through Flanigan's date last insured of December 31, 2008 is supported by substantial evidence. It is unfortunate that Flanigan's eligibility for benefits ended on December 31, 2008 and his apparently disabling conditions arose sometime thereafter. While the Court is

---

27/   (...continued)
Astrue, No. 11-CV-614, 2012 WL 2405197 at *3 (W.D.N.Y. June 25, 2012) ("'[D]isability for purposes of workers' compensation benefits is determined under a different standard than the standard used in the Social Security context[.]'"); Lefever v. Astrue, No. 07-CV-622, 2010 WL 3909487 at *13 (N.D.N.Y. Sept. 30, 2010) ("Workers' compensation determinations are directed to the workers' prior employment and measure the ability to perform that employment rather than using the definition of disability in the Social Security Act. Because disability for purposes of workers' compensation benefits is determined under a different standard than the standard used in the Social Security context, the ALJ is not bound to afford [the treating physician's] finding controlling weight." (citation omitted)), aff'd, 443 F. App'x 608 (2d Cir. 2011); Fortier v. Astrue, 09 Civ. 993, 2010 WL 1506549 at *24 (S.D.N.Y. Apr. 13, 2010) ("[F]indings of disability for workers' compensation purposes are of limited utility for disability purposes under the Social Security Act. Those findings are geared to the person's prior employment and allow findings of partial disability." (quotations omitted)); DeJesus v. Chater, 899 F. Supp. 1171, 1177 (S.D.N.Y. 1995).

38

sympathetic to Flanigan, the Court must follow the law.  The Commissioner's motion for judgment on the pleadings (Dkt. No. 16) is <u>GRANTED</u>.[28/]   The Clerk of Court shall enter judgment accordingly.

        SO ORDERED.

Dated:      New York, New York
            May 15, 2014


                                    _____
                                    **Andrew J. Peck**
                                    United States Magistrate Judge

Copies to:      John M. Flanigan (Mail)
               Kirti Vaidya Reddy, Esq. (ECF)

---

[28/]    If Flanigan requires copies of any of the cases reported only in Westlaw, he should request copies from opposing counsel.  <u>See</u> <u>Lebron</u> v. <u>Sanders</u>, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.